Chase, deceased, and that the beneficiaries under her will are entitled to an equitable division and distribution thereof by the trustees according to the provisions of said will.

Judgment accordingly.

## FOSS v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, First Department. April 3, 1914.)

1. APPEAL AND ERROR (§ 281*)—PRESENTING QUESTIONS IN LOWER COURT—MOTION FOR NEW TRIAL.

Where there was no motion for a new trial, an appeal presents questions of law only.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1650–1661, 3024, 3281; Dec. Dig. § 281.*]

2. BROKERS (§ 65*)—COMPENSATION—COMMISSION FROM ADVERSE PARTY.

An agreement by a real estate broker to endeavor to procure certain tracts of land for an intending purchaser at the lowest price possible without disclosing the name of the purchaser, but to secure his commission from the vendors, the purchaser agreeing only not to purchase through any one else, is not contrary to public policy, if the vendors are given to understand that, while they were to pay the commission, the broker was representing the purchaser.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§.48–50; Dec. Dig. § 65.*]

3. BROKERS (§ 88*)—ACTIONS—SUFFICIENCY OF EVIDENCE—GOOD FAITH.

In an action against the purchaser for breach of its agreement not to purchase through another, evidence held not to show, as a matter of law, that the broker did not endeavor in good faith to induce the owners to offer the property at the lowest price at which they would sell.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§· 121, 123–130; Dec. Dig. § 88.*]

4. APPEAL AND ERROR (§ 927*)—TAKING CASE FROM JURY—WEIGHT OF EVIDENCE.

In determining whether a complaint should be dismissed or verdict directed for the defendant for lack of evidence, the testimony of the plaintiff must be taken to be true, and he is entitled to the most favorable inference to be drawn from all the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2912, 2917, 3748, 3758, 4024; Dec. Dig. § 927.*]

5. BROKERS (§ 9*)—REPRESENTATION BY OFFICERS—CONTRACT.

An agreement · by the president of a corporation with a real estate broker that, so long as he remained the head of the company, it would not purchase certain tracts of land through any one but the broker is not binding upon the company after the resignation of the president, although he remained a member of the board of directors and of the committee in charge of the purchase of that property.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 10; Dec. Dig. § 9.*]

6. BROKERS (§ 41*)—CONTRACTS BY OFFICERS—RATIFICATION.

The fact that, after the resignation of the president, the company purchased one of the tracts through the broker for which he collected a commission from the vendors, and continued negotiations through him for a time for the other tracts, was not a ratification of the agreement of the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

former president or a new agreement by implication on the part of the company not to purchase through another.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 41; Dec. Dig. § 41.*]

Ingraham, P. J., and McLaughlin, J., dissenting in part.

Appeal from Trial Term, New York County.

Action by Archibald C. Foss against the New York Central & Hudson River Railroad Company. Judgment for the plaintiff, and defendant appeals. Reversed, and complaint dismissed.

See, also, 144 N. Y. Supp. 1116.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Austen G. Fox, of New York City, for appellant.

Grant C. Fox, of New York City (Stanley Holcomb Molleson, of New York City, on the brief), for respondent.

LAUGHLIN, J.   The plaintiff is a real estate broker, and he brought this action, not to recover commissions, but to recover damages for a breach of a parol contract alleged to have been made between him and the defendant in 1906, by which he claims that the defendant, through William H. Newman, who was then its president, employed him to endeavor to negotiate the purchase of seven parcels of real estate, known as the "King Estate," at Weekawken, N. J., on terms satisfactory to the defendant; he, however, to receive no commissions from defendant, and it agreeing with him "that in the event it purchased said property, and in the event it purchased any of said parcels thereof, it would purchase the same through him" as its broker, so that "he might obtain commission from the owners of said property and of said parcels on the sales thereof." The plaintiff alleges that he negotiated for the defendant the purchase of three of said parcels, and received commissions thereon from the owners; and that he subsequently endeavored to negotiate the purchase for it of the remaining four parcels, and obtained an agreement from the owners that they would pay him the usual commissions "on each and every sale of said parcels in which plaintiff should be the broker for the purchaser at said sale or sales"; and that he was "ready, willing, and able and offered to the defendant to do and did do all things necessary as its broker to negotiate the purchase of said parcels for the defendant on terms satisfactory to it," but that the defendant purchased said four parcels, in violation of its agreement with him, and to his damage in the sum of $25,000, being the amount of the commissions he would have received had the purchase been made through him.

At the close of the plaintiff's case, counsel for defendant moved for the dismissal of the complaint on the grounds, among others: (1) That plaintiff had not proved the cause of action alleged or any cause of action; (2) that the agreement, as testified to by the plaintiff, was that the defendant would not purchase the property through any one but plaintiff as broker so long as Mr. Newman remained "head of the

company," and that Mr. Newman ceased to be president and head of the company long prior to the purchases of the last four parcels; (3) that it was not a violation of the agreement, which plaintiff testified Newman made with him, for the defendant to purchase the property direct from the owners, as it did, without employing or paying a commission to any other broker, and especially so since one of the owners refused to negotiate a sale through the plaintiff; (4) that the contract is void as against public policy on the ground that the plaintiff led the owners to believe that he was acting solely for their interests in endeavoring to procure the highest prices obtainable for their lands, and at the same time was assuring the defendant that he was endeavoring to procure the property for it at as low a price as possible, and did not disclose "to either party that he was professing to the other to be acting in the interests solely of the latter." The motion was denied, and an exception duly taken. Defendant thereupon rested without offering any evidence, and moved for a direction of a verdict, on which motion the court reserved decision and submitted the case to the jury.

[1] There was no motion for a new trial, and therefore the appeal presents questions of law only.

[2, 3] The first point urged by the learned counsel for the appellant is that the contract, as shown, violated the legal and moral duty of the plaintiff as a broker representing the owners, and therefore contravenes public policy and is void and unenforceable. It is not contended that the mere making of an agreement by the plaintiff with the owners to receive commissions from them in the event of a sale of their lands through him violated his contract with defendant. It was from the outset understood between the plaintiff and the defendant's president that plaintiff was to receive no compensation from the defendant but was to be at liberty to obtain commissions from the owners, which is the only manner contemplated for his receiving compensation for his services.

It is quite apparent that, in such circumstances, it was the duty of the plaintiff to act in entire good faith with the defendant. He accepted employment from it before he obtained any agreement from the property owners, either for a sale of their property or for the payment of commissions. It was also his duty to endeavor to obtain for the defendant an offer for the sale of the property at the lowest price at which the owners were willing to sell. The questions of good faith were submitted to the jury, and, if questions of fact, the verdict is now conclusive.

The trial was in 1913, nearly eight years after the negotiations involved in this action commenced, and plaintiff had very little recollection independent from the contents of the correspondence had at the time. The property in question is water front property and is situated immediately to the south of the defendant's West Shore Railroad Terminal at Weekawken. Plaintiff discovered that it was for sale and the price one of the interested parties was asking, and he conceived the idea that the defendant might be interested in purchasing it. Accordingly on the 7th of September, 1905, he wrote the president of the defendant, apparently without authority from the owners of

the property, stating that he was offering the property for sale, and that he had been informed that the owners had offered it for sale at $1,000 per front foot, and saying that, if Newman would make him an offer, he would be pleased to submit it to the owners and to endeavor to get them together, and closing as follows:

"I shall be pleased to assist you in securing this property at as low a price as possible if you wish to purchase it."

Having received no reply to that letter, he wrote Mr. J. P. Morgan on September 23, 1905, drawing his attention to the property, and asking if he would not consider forming a company to develop the property if none of the companies in which he was interested desired to purchase it. This letter was forwarded to Newman, and by letter under date of September 26, 1905, he invited the plaintiff to call. Plaintiff called pursuant to the invitation and was informed that Newman would be interested in purchasing the property, but "wanted the very lowest price that could be gotten on it," and plaintiff promised to see the various owners "and try to get a very low price."

The plaintiff, after his first interview with Newman, but before the contract in suit was made with the defendant, called upon several of the most influential of the property owners and endeavored to induce them to fix a selling price for their lands; but this they would not do, and suggested that he present an offer from his client. He reported the result of his interviews to Newman, who, pursuant to authority conferred upon him by the executive committee of defendants' board of directors subsequently, authorized him to make an offer on each of the seven parcels conditioned upon all being sold, and he presented that offer to the several owners by letters under date of February 23 or 24, 1906. Plaintiff had agreed with Newman not to disclose to the owner who was desirous of purchasing the property, lest they might ask higher prices; and he faithfully kept that agreement.

I am of opinion that plaintiff had a right to make the agreement both with defendant and with the property owners, provided he did not deceive the owners into thinking that he was representing them. I see no objection to a broker, representing one desirous of purchasing property, going to the owner and saying:

"I know some one who may purchase your property if you will offer it at a reasonable figure, and I am representing him, but I shall not proceed with the negotiations unless you agree to pay for my services, which are to be rendered to the purchaser from whom I am to receive no compensation."

That is in effect what the plaintiff did in this case. The property owners knew from the outset that the plaintiff was representing some one who desired to purchase their property, but who did not wish his identity known, and throughout the correspondence the purchaser is referred to, both by the plaintiff and by the owners and their representatives, as the client of the plaintiff.

A considerable part of the negotiations for the sale of the property was carried on with plaintiff by one James Gore King. King was interested in one of the parcels as trustee, in another as stockholder, officer, and director of the corporate owner, and in three other parcels

as attorney. He testified that in the year 1906, without specifying the date, he had a conversation with the plaintiff with respect to commissions, and agreed for the owners that, if the plaintiff succeeded in selling seven "or possibly six" of the plots at prices for which the owners were willing to sell, "he should receive from the owners a commission of 2½ per cent. to be paid if and when the deed should be delivered and not otherwise," and that he was authorized to make that agreement. King, who represented the owners of five of the parcels, replied on March 26, 1906, by letter to the proposition submitted by plaintiff on February 24th, making a counter proposition, and stating that he understood the owners of the other two parcels were making independent offers. That letter closes as follows:

"With regard to the commission to be paid to you as broker, if the sale is consummated, while we regard two and one-half per cent. (2½%) as too high, considering the great value of this property, yet the owners of each plot are willing to pay at that rate upon the proportion of the price received by them for their respective plots provided the sale is made at the figure I have mentioned, and provided further, that no commission shall be paid or payable in respect of any given plot unless and until the deed of that plot is delivered and the entire purchase price thereof paid. This is to be regarded as one of the conditions of the above offer."

The other owners also agreed to pay like commissions. There was no agreement on the part of plaintiff to do anything for the owners, and he was not vested by them with any discretion. They fixed their selling prices and made their own propositions to him to be presented to his client. On March 30, 1906, he communicated with Newman by letter the substance of the propositions he received from the owners, stating that the owners represented by King would take less than the amount of their offer. After that the plaintiff had further negotiations with the owners with a view to getting their lowest prices, and he communicated by letter, under date of April 4, 1906, to Newman the result of his efforts. According to the plaintiff's testimony, which is uncontroverted, he fully and truthfully informed Newman with respect to his negotiations with the owners. After further negotiations Newman authorized plaintiff to increase the offer to $850 per front foot, and he submitted that proposition to the owners about the middle of April. The owners did not accept this offer, and on April 30th plaintiff wrote King, pursuant to authority from Newman, making a slight increase in the offer and urging the owners at once to fix the lowest price that they would take, and stating that, on the understanding that he would receive a commission of 2½ per cent. from the owners, he would continue to endeavor to make a sale. This offer was met by a counter proposition from King on behalf of all of the owners to sell the entire tract as an entirety for $2,183,930. That offer was rejected by Newman as being $183,930 too high. The plaintiff then endeavored to have the owners reduce their selling price. About this time it appears that there was no prospect of an immediate agreement, and plaintiff became solicitous with respect to the commissions he expected to receive if the deal went through, and he had an interview with Newman, to which he testified as follows:

"I asked Mr. Newman what he could do to protect me, as I was doing everything I could to purchase this property for the New York Central Railroad Company and to keep the identity of the purchaser secret, and he told me that, so long as he was the head of the company, the property would not be bought for the New York Central through anybody but me, to give me an opportunity to make my commission, as I could not tell the sellers who the buyer was, and if anybody later submitted it to them I would have lost my commission."

That is the agreement on which this action is based. On May 31, 1906, King wrote the plaintiff suggesting that, if he could get his client to renew the former offer and would throw off some of his commissions, the owners might sell. The plaintiff forwarded this letter with a letter of his own, under date of June 2d, to Newman, and also asked Newman if defendant would not pay part of the commissions, and was informed that the defendant never did and could not pay commissions. Subsequently King wrote plaintiff:

"If you can secure your commission in whole or in part from the buyer, you are welcome to it."

About this time, King, not knowing that defendant was the plaintiff's client, called on Newman with a view to interesting the defendant in this property, and made the same offer which Newman had previously refused; but he received no encouragement. Plaintiff continued negotiations with the owners, but in June, 1906, he was informed by Newman that, on account of the condition of the money market, the company would not take the matter up again until fall. Nothing of importance transpired thereafter until the middle of March, 1907, when one of the interested parties reopened negotiations by a renewed offer. Plaintiff took this up with Newman and made a counter proposition, with the result that on April 17, 1907, the owners of this parcel conveyed to the Guaranty Trust Company, and on June 14, 1907, the latter company executed a declaration of trust showing that it held the title to the New York State Realty & Terminal Company, a subsidiary company of the defendant. On that sale plaintiff received his commissions from the vendor. At Newman's suggestion the plaintiff then resumed negotiations with a view to a further purchase, and a second parcel was purchased and title taken in the name of the plaintiff on September 5, 1907, and, after giving back a purchase-money mortgage and a bond for $400,000, he deeded to the Guaranty Trust Company, which again executed a declaration of trust to the New York State Realty & Terminal Company, and the latter company executed an agreement to save plaintiff harmless from liability on his bond. In that instance plaintiff received his commission from the vendor pursuant to a formal agreement in writing, which had been prepared by one of the attorneys for defendant.

Plaintiff continued his endeavors to obtain an offer from the owners of the other parcels which would be acceptable to the defendant. On the last day of February, 1909, William C. Brown became president of the defendant; Newman having resigned. Newman, however, remained a director and a member of an executive committee of the board of directors. At a meeting of the board of directors

held on the 3d day of March, 1909, Brown drew the board's attention to the advisability of purchasing a third parcel and to the price at which it could be secured, and the matter was referred to him with power. That parcel was subsequently purchased pursuant to the authority thus conferred. In that instance plaintiff agreed to purchase in his own name and made a contract with the owner on March 22, 1909, but on the same day he assigned the contract to the Guaranty Trust Company, and the property was deeded to that company as before, and plaintiff received his commission from the vendor.

On November 10, 1909, plaintiff wrote Brown in effect that it was an advantageous time to purchase the other parcels; but on the 13th of the same month Brown wrote him that the company would not care to consider acquiring the property at that time. At a meeting of the board of directors of the defendant held on March 1, 1910, Brown reported in effect that, in acquiring a right of way for railroad purposes across the lots in question, it had covenanted with the owners to these lots to keep open a road for their use, and that the owners were now demanding that the obligation be complied with; and he evidently deemed it advisable, in the circumstances, to purchase the remaining parcels, although they were not immediately needed for railroad purposes. A resolution was adopted referring the matter to a committee of three, consisting of the president, Newman, and Mr. Harris, one of counsel for defendant, with power to recommend the purchase of the four remaining lots to the board of directors of said terminal company. It appears that King called on Harris in November, 1909, with respect to this right of way; and Harris asked whether King could sell "these properties"; and King replied that he thought he could get the owners to sell the four remaining parcels for $1,000,-000, provided there were no deductions for broker's commission, and that, if the sale were made through him, he would charge no commission for bringing it about. On the 8th day of March, 1910, plaintiff had a conversation with Newman, and the latter suggested that plaintiff obtain prices on any or all of the remaining plots and take the matter up with Brown. Plaintiff having been informed on that day that borings were being made on one of the parcels, and that an option on it had been asked and refused, wrote Brown drawing attention thereto and stating the then status of the other parcels, and asking to be informed "what you wish to do about these different plots." Plaintiff, following this letter, called at Brown's office and was informed by the latter's secretary that the matter was in the hands of Harris; and plaintiff arranged for and had an interview with Harris about the 15th or 16th of March. Harris informed plaintiff that the company had been negotiating with King for some three weeks for the purchase of the property, and asked plaintiff why he thought he should be the broker; and plaintiff said:

"I told him that I considered that I was the broker in the matter, as I had been looking out for the interests of the company, and had tried to get it to the lowest possible price, and had not disclosed the identity of the buyer, and had done everything I could to get it for the company at the very lowest possible amount, and—oh, I also told him that Mr. King was not a disinterested party, as he was the trustee for one of the owners, and held a position of

attorney for some of the others, so that in dealing with him he would be dealing with a representative really of the owners, instead of dealing with a broker who was disinterested and who was working for his—for the interests of the company."

Harris agreed to let plaintiff know his decision as to whether or not he would recognize plaintiff as the broker, and telephoned him shortly thereafter that he had decided to close the purchase of the property through King.

It does not appear that the plaintiff informed either Brown or Harris of the agreement he had made with Newman, or that he asserted to any of them that he would claim that he was continuing to work under that agreement after Newman ceased to be president, or would maintain that the company could not purchase the property directly from the owners or through another broker on account of Newman's agreement.

[4] On the question as to whether the complaint should have been dismissed or a verdict directed for the defendant, the testimony of the plaintiff must be accepted as true, and he is entitled to the most favorable inference to be drawn from all the evidence. It may be that there was a question of fact for the jury as to whether the plaintiff acted in good faith in the performance of his agreement with the defendant, for in one view of some of his letters it would seem that he was intending to give the owners the impression that he could get his client to purchase the property without their reducing the figures at which they had offered it. I think, however, that it cannot be said, as matter of law, that the contract upon which he sues was void as against public policy, or that he did not endeavor in good faith to induce the owners to offer the property at the lowest price at which they would sell.

[5] I fail to see, however, how the recovery can be sustained in view of the fact that the only agreement upon which plaintiff claims the right to recover is the agreement made by Newman that so long as he remained head of the company the property would not be purchased through anybody but the plaintiff. At most that was an agreement not to purchase through another broker, and as a matter of fact the property was not purchased through another broker. If the agreement be taken literally and the purchase had been made while Newman remained president, it is doubtful whether plaintiff would have been entitled to recover. Newman doubtless had authority to make certain agreements that would survive his presidency of the company; but this agreement was expressly limited to the period of his presidency. There is not force in the suggestion that he was the head of the company after he ceased to be president merely because he remained a member of the board of directors and of the executive committee, and was a member of the special committee having authority to purchase the property in question. It appears that individually he had no special authority, and that the matter was in the hands of Messrs. Brown and Harris.

[6] The fact that one parcel was purchased through the plaintiff, so that he received commissions from the vendor after Brown became president, was not a recognition of Newman's agreement. The com-

pany neither paid nor agreed to pay plaintiff any commissions. The continuance of negotiations with him to the extent stated, after Brown became president, was neither a continuance of Newman's agreement that the company would not purchase the property through any one else, nor a new agreement by implication to that effect. I am of opinion, therefore, that the plaintiff failed to establish a cause of action, and that his complaint should have been dismissed.

It follows that the judgment and order should be reversed, with costs, and the complaint dismissed, with costs on the motion made at the close of the plaintiff's case.

CLARKE and SCOTT, JJ., concur.

INGRAHAM, P. J. (dissenting in part). I concur in the reversal of this judgment and dismissal of the complaint on the ground stated by my Brother LAUGHLIN, but I do not concur with him in his conclusion that a broker engaged in a negotiation for the sale of real property can receive a commission from the seller and at the same time contract with the purchaser to receive an advantage from him without disclosing such contract to the seller. A broker approaching the owner of real estate with an offer to purchase the property and making an agreement with the owner of the property that he shall receive a commission from the owner for his services in selling the property assumes towards the seller a position in which the utmost good faith is required on his part. The very fact that he undertakes to act in that capacity imposes this obligation upon him, and whether he gives up the name of the customer or not, if he is to receive his commission from the seller, he cannot place himself in a position antagonistic to the seller's interest and procure any advantage from the purchaser without disclosing the true condition of the seller. The plaintiff here assumed from the beginning of the negotiation that he was to get his commission from the seller. The fact that he represented the purchaser in his endeavors to procure the property at as small a price as possible justified him in going to the owners of the property and making an offer and endeavoring to get the property at as low a price as possible; and, if he had acted openly with the owners and stated that he represented the purchaser, there would have been no objection to the transaction. But that he never did. He went to the owners of the property with the offer and demanded a commission if he carried out the transaction. To that the owners agreed. He thereby became bound to state to the owners, who were to pay him for the services, that he rendered his relation to the persons who had made the offer, and that he was acting for them in procuring the property at as small a price as possible and could not be depended on to represent the owners in the transaction, and to show the utmost good faith. And it seems to me that, if he had completed the sale, the owners could have refused to pay him any commission upon the ground that, having brought an offer to them and asked them for a commission for services that he rendered to them in making a sale, he was all that time acting against their interests and was endeavoring, not to induce the purchaser to

pay more, but to induce the seller to take less. This seems to me to be a distinct violation of his duty to the sellers, as laid down in Dickinson v. Tysen, 209 N. Y. 395, 103 N. Y. Supp. 703. Certainly if he could not have recovered the commission as against the seller he suffered no damage because the defendant did not make the final offer to him which resulted in the purchase of the property.

McLAUGHLIN, J., concurs.